Harold UMANSKY, Individually and
as Personal Representative of the Estate of
Richard Umansky and Thelma Umansky,
Plaintiffs-Appellants-Cross-Respondents,

v.

ABC INSURANCE COMPANY, Defendant,

Barry FOX,
Defendant-Respondent-Cross-Appellant-Petitioner.

Supreme Court

*No. 2007AP385. Oral argument February 4, 2009.
—Decided July 17, 2009.*

2009 WI 82

(Also reported in 769 N.W.2d 1.)

For the respondent-cross-appellant-petitioner the cause was argued by *John J. Glinski,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the plaintiffs-appellants cross-appellants there was a brief filed by *J. Michael Riley, Timothy M. Barber,* and *Axley Brynelson, LLP,* Madison, and oral argument by *J. Michael Riley.*

An amicus curiae brief was filed by *James Olson* and *Lawton & Cates, SC*, Madison, on behalf of the Wisconsin Association for Justice.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published court of appeals decision[1] that reversed a grant of summary judgment for the petitioner and remanded the case to the circuit court. This wrongful death case concerns a claim by cross-respondents (the Umanskys) that Barry Fox (Fox), the director of facilities for Camp Randall Stadium, negligently caused the death of Richard Umansky (Umansky) by failing to enforce a specific safety regulation at Camp Randall. Umansky was a television cameraman for ABC, Inc. He fell approximately eight feet to his death from a four-foot by eight-foot platform supplied by the University. There was no railing on Umansky's platform at the time. The Wisconsin legislature has adopted federal safety regulations and made them applicable for all public buildings, and such regulations require that railings be installed on platforms like the one from which Umansky fell.

¶ 2. As a state employee, however, Fox enjoys immunity from liability unless, under the circumstances, at least one of the limited exceptions to immunity applies. We must address whether Fox's obligation pursuant to statute to act to ensure that Camp Randall Stadium complies with the Occupational Safety and Health Administration (OSHA) regulation requiring a

[1] *Umansky v. ABC Ins. Co.,* 2008 WI App 101, 313 Wis. 2d 445, 756 N.W.2d 601.

railing on certain types of platforms creates a ministerial duty exception to the standard rule of state employee immunity. Specifically, the narrow question we address is whether Fox had a ministerial duty under 29 C.F.R. § 1910.23(c)(1), incorporated by Wis. Admin. Code §§ Comm 32.15 and 32.50 (Aug. 2004),[2] to have a rail on the platform from which Umansky fell. Finding that no exception applied, the Dane County Circuit Court, the Honorable John C. Albert presiding, granted summary judgment for Fox. The Umanskys appealed. The court of appeals reversed, making a number of rulings favorable to the Umanskys related to the issue of whether Fox had a ministerial duty and is thus unable to claim immunity.

¶ 3.    However, the court of appeals declined to address one of Fox's arguments, newly made on appeal, deeming it waived. Because of the potential impact of the new argument[3] on a determination of whether Fox's employer was required by state law to comply with the applicable regulation, the court of appeals stopped short of holding that the regulation applied to Fox's employer, leaving that determination to be made on

---

[2] All subsequent references to the Wisconsin Administrative Code are to the August 2004 version unless otherwise indicated. The relevant language in the sections cited herein has remained unchanged since it took effect on March 1, 1999.

[3] The new argument was that Fox was entitled to summary judgment because the plaintiff had not alleged facts showing that the platform was a workspace for public employees, and thus had made no showing that Fox's employer had a duty of any sort with respect to the platform. In other words, the argument was that any duty to ensure the safety of the platform would have belonged to the employer of the private employee who used it. Here the argument by the petitioner has brought into sharp focus the issue as to whether the regulations apply to public buildings of a public employer such as Fox's employer.

remand to the circuit court. The court of appeals thus made a number of rulings[4] with which we agree and which we adopt and ultimately concluded that Fox was not entitled to summary judgment on the ground of immunity:

> [W]e conclude Fox was responsible for compliance with state and federal safety regulations and this job responsibility is sufficient to impose on him the duty to comply with 29 C.F.R. § 1910.23(c)(1) insofar as the regulation applies to his employer. We further conclude that, given the height and structure of the platform from which Umansky fell, Fox had a ministerial duty to have a standard railing or an alternative as specified in 29 C.F.R. § 1910.23(c)(1) on the open side or sides of the platform, if Fox's employer was required by state law to comply with this regulation as to this platform.

*Umansky v. ABC Ins. Co.*, 2008 WI App 101, ¶ 3, 313 Wis. 2d 445, 756 N.W.2d 601. Fox petitioned for review and we granted his petition.

---

[4] The court of appeals stated:

> [W]e make a number of rulings related to the exception. First, the nondelegability to third parties of an employer's duty under the safe place statute does not prevent suit against a state employee for failure to comply with a safety regulation adopted pursuant to Wis. Stat. § 101.055(3) (2001–02). Second, the "law" that is the source of the ministerial duty need not specify the employee position responsible for carrying out the duty; it is sufficient if the "law" imposes a duty that is ministerial and other evidence establishes that a particular employee is responsible for carrying out that duty. Third, a regulation that otherwise imposes a ministerial duty is not discretionary simply because the supervisory employee responsible for compliance with the regulation has discretion with respect to assigning tasks to carry out that duty. Fourth, 29 C.F.R. § 1910.23(c)(1), incorporated by Wis. Admin. Code §§ Comm 32.15 and 32.50, imposes a ministerial duty to have a railing meeting the specifications of the regulation on a platform that meets the requirements of the regulation.

*Umansky,* 313 Wis. 2d 445, ¶ 2.

¶ 4. We now adopt and affirm those court of appeals' rulings listed above. We conclude that Fox had a ministerial duty here. His job description provided that he was responsible for compliance with state and federal safety regulations, including 29 C.F.R. § 1910.23(c)(1). "[G]iven the height and structure of the platform from which Umansky fell, Fox had a ministerial duty to have a standard railing or an alternative as specified in 29 C.F.R. § 1910.23(c)(1) on the open side or sides of the platform . . . ." *Umansky,* 313 Wis. 2d 445, ¶ 3. Further, because we reach and ultimately reject the argument that the regulation at issue does not apply to Fox's employer, our holding resolves the remaining question from the court of appeals' rulings. We thus remand to the circuit court, having answered the threshold question concerning Fox's immunity from suit by concluding that Fox had a ministerial duty to perform the act of ensuring that the platform complied with the applicable regulation. The focus of the circuit court must be on breach, causation, comparison of fault, and damages, not on the question of by whom the deceased was employed. We remand for a trial on the Umanskys' negligence claim.

¶ 5. We first set forth the factual background and the applicable legal framework in Parts I and II. In Part III, we address the specific regulation that creates the ministerial duty exception here. In Part IV, we discuss the applicability of the regulation to all public buildings of a public employer. In Part V, we discuss the inapplicability of the Safe Place Statute to this case.

## I. BACKGROUND

¶ 6. The court of appeals set forth the facts and procedural history as follows:

Umansky was employed as a cameraman by ABC Inc. On November 21, 2003, he was found lying unconscious beneath a platform from which he had been working at the University of Wisconsin's Camp Randall Stadium. He later died as a result of injuries sustained from falling from the platform to the concrete walkway below.

Umansky's parents and the Estate of Richard Umansky filed this action against Fox, claiming that Umansky's fall was caused by Fox's negligence. The amended complaint alleged that Fox was responsible for the safety of Camp Randall Stadium, including compliance with state and federal safety regulations, and that he was negligent in failing to ensure that the platform was reasonably safe and in failing to comply with the applicable regulations, including failing to provide railings on the platform in violation of 29 C.F.R. § 1910.23(c)(1).

. . . .

[After a motion to dismiss was denied,] Fox moved for summary judgment based on discretionary act immunity for public employees. He submitted his affidavit in which he averred that the platform from which Umansky fell had been in use by ABC Inc. and other broadcasting companies for several years prior to the accident, and no one had indicated to him that the platform was not safe or did not comply with applicable regulations. Umansky's submissions included Fox's deposition, the Occupational Safety and Health Administration (OSHA) accident investigation report, and a citation and notification of penalty to ABC Inc. for a violation of 29 C.F.R. § 1910.23(c)(1). The regulation provides: "Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. . . ."

*Umansky,* 313 Wis. 2d 445, ¶¶ 6–9.

¶ 7. As noted above, the circuit court granted Fox's motion for summary judgment, reasoning that neither the ministerial duty exception nor the known danger exception applied in this case; because it found no applicable exception, the circuit court found that Fox's immunity as a state employee barred a suit. As noted above, the court of appeals reversed.

## II. STANDARD OF REVIEW AND RELEVANT LAW

■

¶ 8. We review a grant of summary judgment de novo. *See Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Wis. Stat. § 802.08(2) (2001–02)[5].

■

¶ 9. Immunity for public officers and employees is grounded in common law, *Kimps v. Hill,* 200 Wis. 2d 1, 9, 546 N.W.2d 151 (1996), and is based largely on "public policy considerations that spring from an interest in protecting the public purse and a preference for political rather than judicial redress" for actions. *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, 253 Wis. 2d 323, ¶ 23, 646 N.W.2d 314.

■■

¶ 10. The general rule is that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties. *Kimps,* 200 Wis. 2d at 10. The rule,

---

[5] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

however, is subject to exceptions, representing a "judicial balanc[e] [struck between] the need of public officers to perform their functions freely [and] the right of an aggrieved party to seek redress." *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 300, 240 N.W.2d 610 (1976). The exception at issue in this case is that a state employee "is not shielded from liability for the negligent performance of a purely ministerial duty." *Kimps,* 200 Wis. 2d at 10.

■■

¶ 11.   The definition of ministerial duty has remained substantially the same since it was adopted in 1955 in *Meyer v. Carman,* 271 Wis. 329, 73 N.W.2d 514 (1955): "'A . . . duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.'" *C.L. v. Olson,* 143 Wis. 2d 701, 711–12, 422 N.W.2d 614 (1988) (quoting *Lister,* 72 Wis. 2d at 301).

■■

¶ 12.   The defense of discretionary act immunity for public officers and employees assumes negligence and focuses on whether the action or inaction upon which liability is premised is entitled to immunity. *Lodl,* 253 Wis. 2d 323, ¶ 17. The proper scope of the common law doctrine of discretionary act immunity, when there are no disputed facts, is a question of law. *Bicknese v. Sutula,* 2003 WI 31, ¶ 15, 260 Wis. 2d 713, 660 N.W.2d 289.

III.   THE MINISTERIAL DUTY EXCEPTION

¶ 13.   We begin by setting the question we are to answer into context. The Umanskys' claim is that Fox negligently caused the death of Umansky. The amended complaint alleges:

> At all times pertinent to this action [Fox] was respon-
> sible for the condition of the Camp Randall Stadium
> where Richard Umansky was killed, and was specifi-
> cally responsible for the safety of the facility, including
> compliance with the state and federal regulations.
>
>     . . . .
>
> On information and belief, the incident was caused by
> the negligence of Barry Fox . . . in failing to ensure the
> platform from which Richard Umansky fell was reason-
> ably safe, failing to comply with OSHA regulations,
> failing to comply with Wisconsin safety regulations for
> similar structures, failing to establish appropriate
> guidelines and practices to ensure compliance with
> OSHA and State safety regulations, failing to provide
> and maintain a safe environment within Camp Randall
> Stadium, failing to provide railings on the platform
> from which Richard Umansky fell in violation of 29
> CFR 1910.23(c)(1). . . .

¶ 14.   Of course, before the Umanskys can proceed
to attempt to prove their negligence case, they must
first defeat Fox's defense of immunity, to which he is
entitled as a state employee unless an exception ap-
plies.[6] The Umanskys argue that the ministerial duty
exception applies to defeat Fox's immunity.[7] As dis-
cussed above, "a public officer or employee is not

---

[6] The Umanskys suggest that this court should use this case
to state a new rule limiting the discretionary immunity doctrine
to those state employees involved in legislative or judicial
policymaking. Under such an approach, they argue, Fox would
have no immunity. We decline to do so.

[7] The Umanskys argue that another exception, the "known
danger" exception, applies as well. That exception, set forth in
*Cords v. Anderson,* 80 Wis. 2d 525, 259 N.W.2d 672 (1977), is
present where "the nature of the danger is compelling and
known to the officer and is of such force that the public officer

shielded from liability for the negligent performance of a purely ministerial duty." *Kimps,* 200 Wis. 2d at 10. We turn, then, to this preliminary question. To answer it, we will consider the relevance of safety regulations applicable to the platform under state law for the limited purpose of establishing whether the regulations satisfy the definition of a ministerial duty and therefore constitute an exception to the rule giving Fox immunity from liability.

¶ 15. If Fox was subject to a "purely ministerial duty" to have a railing installed on the platform, he is not immune from liability. As we noted previously, a duty is a "purely ministerial duty" if it is "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *C.L.,* 143 Wis. 2d at 711 (citing *Lister,* 72 Wis. 2d at 301).

¶ 16. We first need to determine whether a source of law "imposes, prescribes and defines the time, mode and occasion for [the] performance [of a specific task]." *C.L.,* 143 Wis. 2d at 711. At the beginning of its analysis, the court of appeals identified the specific act at issue and the law which requires it:

---

has no discretion not to act." *C.L. v. Olson,* 143 Wis. 2d 701, 715, 422 N.W.2d 614 (1988). In regard to that exception, we agree with the court of appeals that it is not clear from the amended complaint that "the platform presents the type of compelling danger that warrants an exception to immunity." *Umansky,* 313 Wis. 2d 445, ¶ 69. The known danger exception "has been reserved for situations that are more than unsafe, where the danger is so severe and so immediate" that a response is demanded. *Id.,* ¶ 70. There is no need for us to address that exception any further here.

[T]he allegation of a failure to provide railings in violation of 29 C.F.R. § 1910.23(c)(1) does allege a specific act Fox failed to perform, and this, the plaintiffs assert, is the source of his ministerial duty.

29 C.F.R. § 1910.23(c)(1) provides: (c) Protection of open-sided floors, platforms, and runways. (1) Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing [defined in paragraph (e)(1)[8]] (or the equivalent as specified in paragraph (e)(3)[9] of this section)[.]

. . . .

OSHA regulations in general, and this one in particular, do not apply directly to the University of Wisconsin because a state and its subdivisions are excluded from the definition of "employer." Williams-Steiger Occupational Safety and Health Act of 1970, Pub. L. No. 91–596, § 3(5), 84 Stat. 1590, 1591 (1970); 29 C.F.R. § 1910.2(c). However, Wis. Admin. Code § Comm 32.15

---

[8] 29 C.F.R. § 1910.23(e)(1) provides:

A standard railing shall consist of top rail, intermediate rail, and posts, and shall have a vertical height of 42 inches nominal from upper surface of top rail to floor, platform, runway, or ramp level. The top rail shall be smooth-surfaced throughout the length of the railing. The intermediate rail shall be approximately halfway between the top rail and the floor, platform, runway, or ramp. The ends of the rails shall not overhang the terminal posts except where such overhang does not constitute a projection hazard.

[9] 29 C.F.R. § 1910.23(e)(3)(v) provides:

Other types, sizes, and arrangements of railing construction are acceptable provided they meet the following conditions: (a) A smooth-surfaced top rail at a height above floor, platform, runway, or ramp level of 42 inches nominal; (b) A strength to withstand at least the minimum requirement of 200 pounds top rail pressure; (c) Protection between top rail and floor, platform, runway, ramp, or stair treads, equivalent at least to that afforded by a standard intermediate rail . . . .

provides, with certain exceptions not applicable here, that "all places of employment and public buildings of a public employer shall comply with the federal [OSHA] requirements adopted under s. Comm 32.50." Wisconsin Admin. Code § Comm 32.50(2) adopts 29 C.F.R. pt. 1910, thus making § 1910.23 applicable to places of public employment and to public buildings.

*Umansky*, 313 Wis. 2d 445, ¶¶ 25–27.

¶ 17. The court of appeals examined 29 C.F.R. § 1910.23(c)(1) and observed, "The regulation does not allow for the option of no railing in these circumstances and the regulation is very specific as to what type of railing is required. The duty to have a railing meeting the regulation's requirements is imposed by law, it is absolute, certain and imperative, and it requires performance in a specified manner and upon specified conditions that are not dependent upon the exercise of judgment or discretion." *Id.*, ¶ 48. In addition, the court of appeals noted that Fox, in his deposition testimony, had stated that regarding oversight of facility safety, the "day-to-day single responsibility does lie with me" and that the platform's compliance with OSHA requirements "ultimately . . . would have been my decision." *Id.*, ¶ 50.

¶ 18. That determination by the court of appeals —that the highly specific safety regulation in force under Wisconsin law for railings on platforms created a ministerial duty such that there is an exception to the ordinary rule of immunity—was the basis for the court of appeals' reversal of the grant of summary judgment. We agree with the court of appeals that because 29 C.F.R. § 1910.23(c)(1) "imposes, prescribes and defines the time, mode and occasion . . . with such certainty that nothing remains for judgment or discretion" and

636

because Wis. Admin. Code § Comm 32.50(2) makes it applicable to public buildings of a public employer, Fox was under a ministerial duty to act to ensure a railing was on the platform.

## IV. FOX ARGUES THAT ANY DUTY RUNS ONLY TO PUBLIC EMPLOYEES OR ONLY TO A PLATFORM ON WHICH PUBLIC EMPLOYEES WORK

¶ 19. First, Fox contends that the duty created by the OSHA regulation pursuant to administrative code provisions, which in turn are pursuant to statute,[10] is a duty only to public employees. Because Umansky was not a public employee, Fox argues, the duty does not run to him. The basis for this argument is that the relevant administrative code provision notes that its purpose is to create work safety standards for public employees,[11] and the underlying statute has the stated purpose of giving public employees workplace safety protections equivalent to those afforded to private employees under OSHA.[12] We therefore turn our attention from the specific regulation that creates a ministerial duty here to the statute and administrative code sections that authorized it. The stated purpose of the

[10] Wis. Stat. § 101.055(3)(a). *See infra,* ¶ 26 n.18

[11] Wis. Admin. Code § Comm 32.001: "Purpose. This chapter establishes minimum occupational safety and health standards for public employees."

[12] Wis. Stat. § 101.055(1):

Intent. It is the intent of this section to give employees of the state, of any agency and of any political subdivision of this state rights and protections relating to occupational safety and health equivalent to those granted to employees in the private sector under the occupational safety and health act of 1970 (5 USC 5108, 5314, 5315 and 7902; 15 USC 633 and 636; 18 USC 1114; 29 USC 553 and 651 to 678; 42 USC 3142-1 and 49 USC 1421).

statute is to offer *equivalent* occupational safety protections. That purpose is turned on its head by Fox's reading that argues for a divided, haphazardly applicable ministerial duty to comply with the explicit OSHA regulation requiring a railing on a platform. That such an approach is unworkable is readily apparent given the nature of the ministerial duty created by this regulation. The regulation, 29 C.F.R. § 1910.23(c)(1), incorporated by Wis. Admin. §§ Comm 32.15 and 32.50, created a ministerial duty to comply with the safety regulation requiring railings on platforms such as the one involved here. Fox urges the peculiar conclusion that even though the administrative code adopted pursuant to Wis. Stat. § 101.055 admittedly requires the necessary safety provisions in "all places of employment and public buildings,"[13] the statute's stated purpose of protecting public employees somehow justifies allowing the breach of a ministerial duty with impunity, so long as the person injured or killed happens not to be a public employee.

¶ 20.    There is nothing in the statute or in the administrative code provisions which says that compliance with 29 C.F.R. § 1910.23(c)(1) is intended, and is relevant, only when a public employee is injured or killed. Since OSHA does not apply to public employees,[14] there was a need to adopt a Wisconsin OSHA to include those employees. There is nothing to indicate that the legislature intended to create different safety

---

[13] Wis. Admin. Code § Comm 32.002.

[14] 29 U.S.C.A. § 652(5) (defining an employer governed by the regulations as "not includ[ing] the United States (not including the United States Postal Service) or any State or political subdivision of a State").

638

standards for public and private employers and employees; rather, as we noted previously, the intent was to create identical safety standards.[15]

■

¶ 21. There is no dispute that the legislature required all public buildings to be brought into compliance with OSHA minimum standards. There is no dispute that Camp Randall Stadium is a public building, and there is no dispute that the University of Wisconsin is a public employer. It was Fox's responsibility, as director of facilities for Camp Randall Stadium, to be sure that the Stadium complied with OSHA regulations. Period. The OSHA regulation at issue in this case created a ministerial duty, and nothing in our case law on ministerial duty supports the proposition that such a duty can be limited by reference to whether only a particular person is owed that duty.

¶ 22. As we noted earlier in this opinion, the court of appeals deemed a new argument Fox raised at oral argument before it waived and declined to address it though the court left open the possibility that the argument could be pursued on remand to the circuit court. Before this court, Fox made a similar argument. The argument overlaps considerably with the argument just discussed; Fox contends that the question is not whether the platform was generally required to have a railing, but whether the platform was required to have a railing at the time Umansky fell. Fox submits that because there has been no evidence submitted that a public employee was using the platform at the time Umansky fell,[16] the Umanskys have failed to allege

---

[15] See Wis. Stat. § 101.055(1), *supra*, ¶ 19 n.12

[16] At the court of appeals, the argument was presented slightly differently: "Fox asserts that the regulation did not apply because there is no evidence this platform was ever used

facts that would establish a ministerial duty and that summary judgment should therefore be granted in his favor. This is a variation on his earlier argument. The first, addressed above, turns on the identity of the person injured (i.e., if two persons were on the platform and both fell, no ministerial duty exception could apply as to the private employee, and a claim by that person's representative would be barred by immunity). This argument focuses on the platform itself, and the use of the platform by a public employee at the relevant time (i.e., only if it were alleged that a public employee was occupying the platform at the moment the private employee fell, the ministerial duty exception would apparently apply, and a claim by the private employee's representative would not be barred by immunity).

by a public employee as a workspace." *Umansky*, 313 Wis. 2d 445, ¶ 63. However, Fox abandoned that version of the argument before this court. In his brief, he instead stated a more limited argument:

> The question is not whether 29 C.F.R. § 1910.23(c)(1) required the platform to have a railing at all times but whether Wis. Admin. Code §§ Comm 32.15 and 32.50 required the platform to have a railing *at the time* decedent fell. And the answer is no because there is no evidence that any public employees were using the platform *at that time*." (Emphasis added.)

At oral argument, Fox argued, somewhat inconsistently with the brief, that such facts

> would not make any difference as a practical matter because even if public employees had been using the platform at the time Mr. Umansky fell, there would still be no duty on the part of the State that could be delegated to Fox that would run to Mr. Umansky [because] he was a private employee.

Contrary to the dissent's assertion, before this court, Fox sought only to reverse the court of appeals and made no request in the alternative for a remand for additional fact-finding related to the question of the platform's use by public employees. Justice Ziegler's dissent, ¶¶ 105–07

¶ 23. As noted previously, the court of appeals deemed this argument waived but noted that this argument could be developed further at the circuit court. We disagree. Since the issue was raised again here, we exercise our discretion to reach it, rather than deem it waived.[17] Fox's argument to this court was that the material facts—that no public employee was on the platform at the time Umansky fell and that Umansky himself was not a public employee—were undisputed. Because Fox argues that at least one of those conditions would have to be met in order to establish a ministerial duty, he contends that absent such evidence, summary judgment in his favor is appropriate.

¶ 24. Since we have established that a ministerial duty exception arises from 29 C.F.R. § 1910.23(c)(1), incorporated by Wis. Admin. Code §§ Comm 32.15 and 32.50, and Fox's role as the person responsible for acting to ensure that the facilities comply with the regulations, and because we have already rejected Fox's argument that the statute's purpose limits the applicability of the duty to public employees, we view any argument as to other people occupying or not occupying the platform as not material and therefore not necessary to our holding as set forth herein.

¶ 25. We therefore answer in the affirmative the narrow question presented and conclude that the Umanskys can proceed to trial in the circuit court on their claim of negligence. The questions of breach,

[17] *State v. Caban,* 210 Wis. 2d 597, 609, 563 N.W.2d 501 (1997) ("The rule of waiver is one of judicial administration and does not limit the power of an appellate court in a proper case to address issues not raised in the circuit court. *Wirth v. Ehly,* 93 Wis. 2d 433, 444, 287 N.W.2d 140 (1980). This court has the power in the exercise of its discretion, to consider issues raised for the first time on appeal.")

causation, comparison of fault, and damages will of course need to be addressed by the trier of fact.

## V. THE SAFE PLACE STATUTE

¶ 26. In addition, Fox argues that the OSHA regulations in force pursuant to Wis. Admin. Code §§ Comm 32.15 and 32.50 and pursuant to Wis. Stat. § 101.055(3)(a)[18] articulate the standard under the safe place statute, Wis. Stat. § 101.11.[19] The statute adopting OSHA standards for public employees is therefore properly read, Fox asserts, in tandem with the safe place statute. Fox then points to case law that holds that the obligations the safe place law imposes on employers cannot be delegated. *See, e.g., Dykstra v. Arthur G. McKee & Co.,* 100 Wis. 2d 120, 132, 301 N.W.2d 201 (1981) ("[T]he person who has that duty

---

[18] Wis. Stat. § 101.055(3) Public employee safety and health:

(a) The department shall adopt, by administrative rule, standards to protect the safety and health of public employees. The standards shall provide protection at least equal to that provided to private sector employees under standards promulgated by the federal occupational safety and health administration[] . . . .

[19] Wis. Stat. § 101.11 Employer's duty to furnish safe employment and place:

(1) Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

cannot assert that another to whom he has allegedly delegated the duty is to be substituted as the primary defendant in his stead for a violation of safe place provisions."); *Pitrowski v. Taylor,* 55 Wis. 2d 615, 627, 201 N.W.2d 52 (1972) ("[T]he duty of complying with [the safe place statute] is on the employer[.] . . . It cannot be delegated to or placed upon . . . officers or employees.").

¶ 27. We are, of course, not dealing here with a claimed violation of the safe place statute at all. The complaint of the Umanskys makes it clear that the claim underlying the questions we address here as to immunity is one of common law negligence. We agree with the court of appeals that there is "no logical connection between an employer's inability to shift its liability for a safe place violation to a third party and its ability to delegate to an employee the duty to comply with applicable safety regulations." *Umansky,* 313 Wis. 2d 445, ¶ 31. This is not a safe-place statute case, and the rules concerning such claims do not govern here.

## VI. CONCLUSION

¶ 28. We now adopt and affirm those court of appeals' rulings listed above. We conclude that Fox had a ministerial duty here. His job description provided that he was responsible for compliance with state and federal safety regulations, including 29 C.F.R. § 1910.23(c)(1). "[G]iven the height and structure of the platform from which Umansky fell, Fox had a ministerial duty to have a standard railing or an alternative as specified in 29 C.F.R. § 1910.23(c)(1) on the open side or sides of the platform . . . ." *Umansky,* 313 Wis. 2d 445, ¶ 3. Further, because we reach and ultimately reject the argument that the regulation at issue does not apply to Fox's employer, our holding resolves the remaining question from the court of appeals' rulings. We thus remand to the

circuit court, having answered the threshold question concerning Fox's immunity from suit by concluding that Fox had a ministerial duty to perform the act of ensuring that the platform complied with the applicable regulation. The focus of the circuit court must be on breach, causation, comparison of fault, and damages, not on the question of by whom the deceased was employed. We remand for a trial on the Umanskys' negligence claim.

*By the Court.*—The decision of the court of appeals is affirmed, and the cause is remanded to the circuit court for a trial on the claim of negligence.

¶ 29. N. PATRICK CROOKS, J. (*concurring*). I join the majority opinion, but I write separately to highlight the fact that courts in other jurisdictions have taken positions similar to the reasoning of the majority in this case.

¶ 30. The approach that is most logical and remains true to the intent of the statute and the administrative code, is one that applies the safety regulation to the workplace, irrespective of whose employees are working there.

¶ 31. As noted, courts from other jurisdictions have consistently endorsed the idea that state statutes incorporating federal safety regulations apply to places, not people. *Teal v. E.I. DuPont de Nemours & Co.,* 728 F.2d 799, 805 (6th Cir. 1984) ("[O]nce an employer is deemed responsible for complying with OSHA regulations, it is obligated to protect every employee who works at its workplace."); *Hargis v. Baize,* 168 S.W.3d 36, 44 (Ky. 2005) (where defendant's violation of specific OSHA-derived regulation caused death, the deceased plaintiff was "no less entitled to [state safety regulations'] protections" based on the fact that he was not the defendant's employee); *Goucher v. J.R. Simplot Co.,*

709 P.2d 774, 780 (Wash. 1985) ("WISHA regulations should be construed to protect not only an employer's own employees, but *all* employees who may be harmed by the employer's violation of the regulations."). One court stated the rationale for refusing to quibble, where OSHA safety regulations are concerned, about whether the worker injured or killed was owed a particular duty at the site involved:

> [T]he point of this "multi-employer" gloss is that since the contractor is subject to OSHA's regulations of safety in construction by virtue of being engaged in the construction business, and has to comply with those regulations in order to protect his own workers at the site, *it is sensible to think of him as assuming the same duty to the other workers at the site who might be injured or killed if he violated the regulations.*

*United States v. MYR Group, Inc.,* 361 F.3d 364, 366 (7th Cir. 2004) (internal citations omitted) (emphasis added).

¶ 32. Rulings based on the idea that safety regulations are promulgated to apply to a place, not a person, are eminently sensible. Here, the relevant regulations mandate compliance with protections concerning occupational safety equivalent to federal OSHA requirements for "all places of employment and public buildings[.]" Once it has been determined that a statute or regulation imposes a ministerial duty, as we determine here in agreement with the court of appeals, the inquiry should be at an end. The employment status (public or private) of the person injured or killed as a result of a failure to comply with that duty is simply irrelevant to the analysis.

¶ 33. We find in Wis. Stat. § 101.055 and Wis. Admin. Code §§ Comm 32.001, 32.002, 32.15 and 32.50 no indication that the legislature intended any limita-

645

tion when it adopted the measure extending OSHA safety regulations to "all public buildings"; a holding to the contrary would result in unwarranted disparate treatment for similarly situated injured or deceased persons and would simply be unfair.

¶ 34. A public building that is safe for public employees must be safe for everyone, including employees of a private firm. Indeed, the statute also provides that "[t]he department . . . shall plan and conduct *comprehensive safety* and health loss prevention *programs for state* employees and *facilities.*" Wis. Stat. § 101.055(9) (emphasis added). It would seem to go without saying that the legislature intended for public buildings and facilities to be safe for the public, including public employees and employees of a private employer as well. To say otherwise flies in the face of common sense.

¶ 35. For the foregoing reasons, I respectfully concur.

¶ 36. I am authorized to state that Justice DAVID T. PROSSER joins this concurrence.

¶ 37. DAVID T. PROSSER, J. (*concurring*). The overarching issue in this case is whether an employee of the University of Wisconsin-Madison who was responsible for safety at Camp Randall Stadium, including compliance with applicable state and federal safety regulations, is immune from tort liability for the death of a privately employed television cameraman working at the stadium, after the University employee knowingly failed to comply with an applicable state and federal safety regulation and his non-compliance was a substantial factor in causing the cameraman's death.

¶ 38. The issue is stated bluntly so that there can be no mistake about the challenge that confronted this

court. The majority concludes that the University employee is not immune in the narrow circumstances of this case. In my view, the decision represents a small but very welcome correction in the course this court has followed for many years, and I join the majority opinion in full.

¶ 39. I write separately because I believe more change is necessary. This concurrence will attempt to explain how Wisconsin law on government responsibility for torts has come to be what it is.

## I

¶ 40. It has not been easy to sue state government in tort. Since 1848, the Wisconsin Constitution has erected procedural barriers to direct action against the state without legislative consent. Article IV, Section 27 of the constitution provides, "The legislature shall direct by law in what manner and in what courts suits may be brought against the state."

¶ 41. Immunity from substantive liability is different from the procedural immunity embodied in Article IV, Section 27 of the constitution. *City of Milwaukee v. Firemen Relief Ass'n of Milwaukee*, 42 Wis. 2d 23, 34, 165 N.W.2d 384 (1969). As this court observed in 1915, "nonliability for torts arising out of the prosecution of governmental functions is based upon grounds of public policy distinct from the immunity of the sovereign from suit .... No doubt such policy may originally have sprung in a large measure from the conception that the sovereign can do no wrong." *Apfelbacher v. State,* 160 Wis. 565, 575, 152 N.W. 144 (1915).

¶ 42. Over the years, the intellectual underpinnings of the court-created doctrine of substantive governmental immunity from tort liability were severely

criticized. In 1962, this court reacted to that criticism in a landmark decision. In *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962), the court unanimously "disavowed its past decisions and abrogated the principle of governmental immunity." *Scott v. Savers Prop. & Cas. Ins. Co.*, 2003 WI 60, ¶ 76, 262 Wis. 2d 127, 663 N.W.2d 715 (Prosser, J., dissenting). It declared in the clearest possible terms that *"henceforward, so far as governmental responsibility for torts is concerned, the rule is liability—the exception is immunity."* *Holytz,* 17 Wis. 2d at 39 (emphasis added).

¶ 43. The court went on: "This decision is not to be interpreted as imposing liability on a governmental body in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions." *Id.* at 40. For this proposition, the court cited *Hargrove v. Town of Cocoa Beach,* 96 So. 2d 130, 133 (Fla. 1957).[1]

¶ 44. The court also explained that if "the legislature deems it better public policy, it is, of course, free to reinstate immunity." *Holytz,* 17 Wis. 2d at 40. "The legislature may also impose ceilings on the amount of damages or set up administrative requirements which may be preliminary to the commencement of judicial proceedings for an alleged tort." *Id.*

---

[1] In *Hargrove v. Town of Cocoa Beach*, 96 So. 2d 130, 131 (Fla. 1957), a widow sued a municipality for damages for the alleged wrongful death of her husband who died of smoke suffocation after being locked in a jail that was left unattended by a municipal jailer. The Florida Supreme Court held that the widow could maintain an action against Cocoa Beach for the alleged negligence of its police officer acting in the course of his employment. *Id.* at 133–34. The court said the issue was "whether a municipal corporation should continue to enjoy immunity from liability for the wrongful acts of police officers." *Id.* at 131.

¶ 45. The Wisconsin Legislature did not deem it better public policy to go back to nineteenth century theories of immunity. In 1963, it enacted Wis. Stat. § 331.43 (1963–64), entitled "Tort actions against political corporations, governmental subdivisions or agencies and officers, agents or employes; notice of claim; limitation of damages and suits." This statute is now Wis. Stat. § 893.80 (2007–08),[2] and it must be put in context.

¶ 46. The *Holytz* facts involved the governmental immunity of a municipality, the City of Milwaukee. *Holytz,* 17 Wis. 2d at 28–29. That is why 1963 Senate Bill 283, the bill that created Wis. Stat. § 331.43 (1963–64), was requested by the Wisconsin County Boards Association, the Wisconsin Town Boards Association, and the League of Wisconsin Municipalities. But the *Holytz* decision was not confined to the abrogation of municipal government immunity. Again, the court was clear:

> [W]e consider that abrogation of the doctrine [of governmental immunity] applies to all public bodies within the state: *The state,* counties, cities, villages, towns, school districts, sewer districts, drainage districts, and any other political subdivisions of the state—whether they be incorporated or not. *By reason of the rule of respondeat superior a public body shall be liable for damages for the torts of its officers, agents, and employees occurring in the course of the business of such public body.*
>
> So far as the state of Wisconsin and its various arms is concerned, a careful distinction must be made between the abrogation of the immunity doctrine and the right of a private party to sue the state. The difference between governmental immunity from torts and the sovereign immunity of the state from suit was recognized in *Apfelbacher.* . . .

---

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

649

> Henceforward, there will be substantive liability on the part of the state, but the right to sue the state is subject to [Section] 27, [Article] IV of the Wisconsin [C]onstitution . . . . *The decision in the case at bar removes the state's defense of nonliability for torts,* but it has no effect upon the state's sovereign right under the constitution to be sued only upon its consent.

*Holytz,* 17 Wis. 2d at 40–41 (emphasis added) (internal citations omitted).

¶ 47. When *Holytz* abrogated governmental immunity, municipal governments acted quickly to enact some limitations on their new liability in tort. The Wisconsin statute that is now § 893.80 was their answer. However, this statute was not intended to apply to the state.[3] Thus, the state was required to enact other legislation or to look elsewhere for limits on liability or barriers to suit.

¶ 48. The court discussed these principles in *Forseth v. Sweet,* 38 Wis. 2d 676, 158 N.W.2d 370 (1968). In *Forseth,* the court explained the meaning of *Holytz:* Since *Holytz,* it said, "there is *substantive* liability imposed upon the state when its agents, in the course of their employment, commit a tort." *Id.* at 679. It added that, prior to *Holytz,* two reasons supported the state's immunity from suit:

> (1) The sovereign immunity [or governmental immunity] of the king can do no wrong, implemented by denying the doctrine of respondeat superior where an agent of the state was guilty of tortious conduct, and (2) the lack of the procedural implementation of Article IV, Section 27. *Holytz* removed only the first barrier.

*Id.* at 684.

---

[3] *Townsend v. Wis. Desert Horse Ass'n,* 42 Wis. 2d 414, 423, 167 N.W.2d 425 (1969).

650

¶ 49.    The issue in *Forseth* was whether the victim of a state employee's negligence could bring a *direct* action against the state. *Id.* at 679–81. The answer was no. *See id.* at 681. But there was no dispute that the state would be responsible for a damage judgment against a state employee if the state employee's negligence, in the course of his employment, caused injury to Forseth. *Id.* at 679, 681. The court pointed to then-Wis. Stat. § 270.58 (1965–66),[4] which is now Wis. Stat. § 895.46.[5] *Id.* at 681. This statute directs governmental

---

[4] Wisconsin Stat. § 270.58(1) (1965–66) reads as follows:

> State and political subdivisions thereof to pay judgments taken against officers. (1) Where the defendant in any action or special proceeding is a *public officer or employe* and is proceeded against in his official capacity or is proceeded against as an individual because of acts committed while carrying out his duties as an officer or employe and the jury or the court finds that he acted in good faith the *judgment as to damages and costs* entered against the officer or employe *shall be paid by the state* or political subdivision *of which he is an officer or employe.* Regardless of the results of the litigation the governmental unit shall pay reasonable attorney's fees and costs of defending the action, unless it is found by the court or jury that the defendant officer or employe did not act in good faith, when it does not provide legal counsel to the defendant officer or employe. Deputy sheriffs in those counties where they serve not at the will of the sheriff but on civil service basis shall be covered by this subsection, except that the provision relating to payment of the judgment shall be discretionary and not mandatory. In such counties the judgment as to damages and costs may be paid by the county if approved by the county board.

(Emphasis added.)

[5] Wisconsin Stat. § 895.46(1) reads, in part, as follows:

> State and political subdivisions thereof to pay judgments taken against officers. (1)(a) If the defendant in any action or special proceeding is a public officer or employee and is proceeded against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employee and the jury or the court finds that the

651

bodies, including the state, to pay judgments against public officers and employees in most situations. *See* Wis. Stat. § 895.46(1).

¶ 50. The *Forseth* court was unusually candid in summing up the situation:

> This court has made the public policy decision in *Holytz* that it is in the interest of justice to abolish the court-made rule of sovereign immunity[, i.e., governmental immunity]. . . . It is apparent that the present statutory structure gives the state scant protection, for by sec. 270.58 [(1965–66)], Stats., it has made itself fully liable for a judgment when it has no right to control the litigation leading to the judgment. The present system imposes great handicaps upon the legal officers of the state in defending the treasury, while leaving the treasury exposed to liability.

*Forseth,* 38 Wis. 2d at 690. The court speculated that "possibly there was a failure [in the legislature] to appreciate the potential exposure to liability that was to flow from the 1965 amendment that included the state in sec. 270.58 [(1965–66)] as a backstop for any judgment that might be taken against its tortiously culpable employees." *Id.* at 681.

---

defendant was acting within the scope of employment, the judgment as to damages and costs entered against the officer or employee in excess of any insurance applicable to the officer or employee shall be paid by the state or political subdivision of which the defendant is an officer or employee. *Agents of any department of the state shall be covered by this section while acting within the scope of their agency.* Regardless of the results of the litigation the governmental unit, if it does not provide legal counsel to the defendant officer or employee, shall pay reasonable attorney fees and costs of defending the action, unless it is found by the court or jury that the defendant officer or employee did not act within the scope of employment.

(Emphasis added.)

652

¶ 51. The legislature later amended § 270.58 (1965–66) to permit the attorney general to defend state officers and employees in tort suits (such as the present case).

¶ 52. This was Wisconsin law in the late 1960s. In his *Handbook of the Law of Torts,* Professor William L. Prosser cited Florida's decision in *Hargrove* and observed the following:

> [The rationale of *Hargrove*] was followed two years later by Illinois, holding a school district liable when a child was injured by the negligent operation of a school bus. These examples have touched off, during the succeeding four years, a minor avalanche of decisions repudiating municipal immunity, in California, Michigan, Wisconsin, Arizona, Minnesota, and Alaska . . . . *The decisions in Arizona, California and Wisconsin also abolished the immunity of the state* . . . .

William L. Prosser, *Handbook of the Law of Torts* 1012 (3d ed. 1964) (emphasis added) (internal footnotes omitted).

¶ 53. Against this background, we read in the majority opinion the following statement: "The general rule is that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." Majority op., ¶ 10.

¶ 54. How does this square with the decision in *Holytz?*

## II

¶ 55. In *Lister v. Board of Regents,* 72 Wis. 2d 282, 300, 240 N.W.2d 610 (1976), this court stated as follows: "The general rule is that a public officer is not personally liable to one injured as a result of an act performed

653

within the scope of his official authority and in the line of his official duty." The court did not cite any Wisconsin precedent for this statement. Instead, it cited 63 Am. Jur. 2d, *Public Officers and Employees,* Section 288 (1972).[6] *Id.* at 300 n.17. The principle stated in Am. Jur. 2d was indisputably intended to apply to both state and municipal public officers.

¶ 56. Twenty years later, *Kimps v. Hill,* 200 Wis. 2d 1, 10, 546 N.W.2d 281 (1996) (citing *Lister* 72 Wis. 2d at 300), expanded the rule announced in *Lister:* "Under the general rule as applied in Wisconsin, state officers *and employees* are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." (Emphasis added.) This sweeping statement was and is broad enough to cover *all* state employees. In a footnote, however, *Kimps* narrowed the *Lister* rule with respect to municipalities: "The general rule of immunity for state public officers *stands in contrast to that for municipalities* where, 'the rule is liability—the exception is immunity.'" *Id.* at 10 n.6 (quoting *Holytz,* 17 Wis. 2d at 39) (emphasis added). "The common law immunity *for municipalities* was abrogated by this court in *Holytz . . . .*" *Id.* (emphasis added).

¶ 57. These passages are not an accurate statement of the holding in *Holytz,* and they did not anticipate the immunity that courts would continue to bestow upon municipal employees.

¶ 58. The *Kimps* court, after establishing the broad immunity, also stated an exception: "a public

---

[6] "As a rule, a public officer, whether judicial, quasi-judicial, or executive, is not personally liable to one injured in consequence of an act performed within the scope of his official authority, and in the line of his official duty." 63 Am. Jur. 2d, *Public Officers and Employees,* § 288, at 798 (1972).

officer or employee is not shielded from liability for the negligent performance of a purely ministerial duty." *Id.* at 10 (citing *Lister,* 72 Wis. 2d at 300–01).

¶ 59.   Today, *Lister* and *Kimps* provide the framework for analyzing government torts in Wisconsin. Actions by government employees within the scope of their official duties are generally seen as immune from liability. Liability may be found only in narrow exceptions to general immunity. Thus, governmental immunity has been supplanted by an extremely broad public employee immunity created by the Wisconsin Supreme Court.

## III

¶ 60.   Public officer immunity goes back a long way, and to some extent, it is separate from governmental immunity. We all understand the principle that a public officer should not be held liable for doing her job in a proper manner, because we know that even perfect performance, fully authorized by law, may generate litigation from those who are hurt or disadvantaged by public action or policy.

¶ 61.   Professor Prosser explained public officer immunity in 1964 in his *Handbook of the Law of Torts:*

> The complex process of legal administration requires that officers shall be charged with the duty of making decisions, either of law or of fact, and acting in accordance with their determinations. Public servants would be unduly hampered and intimidated in the discharge of their duties, and an impossible burden would fall upon all our agencies of government, *if the immunity to private liability were not extended,* in some reasonable degree, to those who act improperly, or exceed the authority given.

Prosser, *supra,* at 1013–14.

¶ 62. The key words in this passage are "private liability." Public officer immunity made great sense when state and municipal governments had governmental immunity and were able to disavow any liability for the torts of their officers and employees. Public officer immunity still makes good sense when public officers and employees are acting in a legislative or judicial or quasi-legislative or quasi-judicial capacity, where the exercise of discretion is essential.

¶ 63. Public employee immunity does not make good sense under the following circumstances: (1) substantive governmental immunity has been abrogated; (2) governments have accepted a respondeat superior relationship with their employees; and (3) public employee immunity is being used to evade liability for a public employee's obvious breach of a known standard of care.

¶ 64. The current problem is bound up in the term "ministerial duty." Wisconsin courts have taken the principle of "ministerial duty" from a context in which it was valuable and necessary and employed it in a context in which it is unfair and absurd.

IV

¶ 65. In 1951, Eugene Meyer, 14, a student at Hawthorne Junior High School in Wauwatosa, fell from a five-foot retaining wall on school grounds and sustained injuries. *Meyer v. Carman,* 271 Wis. 329, 331, 73 N.W.2d 514 (1955). His guardian ad litem, Patrick T. Sheedy, and his father, Alvin Meyer, filed a tort action in Eugene's behalf against the eight members of the Wauwatosa board of education *individually. Id.* at 330–31. When the case came to the supreme court, the issue was whether Eugene could recover from the school board members *individually* for "failure to erect

and maintain guardrails or other safety devices on the retaining wall." *Id.* at 331. The circuit court had concluded that recovery was possible because the school board members had a ministerial duty under Wis. Stat. § 40.29(2) (1953–54) to "keep the buildings and grounds in good repair, suitably equipped and in safe and sanitary condition at all times." *Id.* (quoting Wis. Stat. § 40.29(2) (1953–54)). The circuit court "applied the rule of law that a public officer who knowingly or negligently fails to do a ministerial act which the law requires him to do may be compelled to respond in damages to an injured party." *Id.* (citing 43 Am. Jur. *Public Officers* § 278, at 90 (1942)).

¶ 66. The supreme court reversed, rejecting Eugene's claim for two reasons. First, the court determined the cited statute imposed duties on the *board. Id.* at 333–34. "Any action taken under the statute must of necessity be an official action of the board. . . . [A]ny failure to take action is the neglect of the board, and no responsibility therefor devolves upon the individual members." *Id.* Second, and more important for our purposes, the court stated that the "duty" to act, upon either the board or its members, was not "ministerial." *Id.* at 331–32. The court stated as follows:

> At first blush it might appear that the duty to keep the school grounds "safe" is ministerial in character, but it is apparent on closer analysis that a great many circumstances may need to be considered in deciding what action is necessary to do so, and such decisions involve the exercise of judgment or discretion rather than the mere performance of a prescribed task. As stated in 18 McQuillin, Mun. Corp. (3d ed.), p. 225, sec. 53.33:
>
> "Official action . . . is ministerial when it is absolute, certain, and imperative, involving merely the execution of a set task, and when the law which

imposes it prescribes and defines the time, mode, and occasion for its performance with such certainty that nothing remains for judgment or discretion."

*Id.* (ellipsis in original).

¶ 67. The court also quoted a Florida case, *First National Bank v. Filer,* 145 So. 204, 207 (Fla. 1933), which stated that:

[A] duty is to be regarded as ministerial, when it is a duty that has been positively imposed by law, and its performance required at a time and in a manner, or upon conditions which are specifically designated the duty to perform under the conditions specified, not being dependent upon the officer's judgment or discretion.

*Meyer,* 271 Wis. at 332.

¶ 68. In examining the *Meyer* case in retrospect, it should be remembered that both governmental immunity and public officer immunity were still in full flower. The court was disturbed that a plaintiff, however sympathetic, was attempting to extract money damages from individual members of the Wauwatosa school board. Because existing governmental immunity rejected the principle of respondeat superior, the court knew that school board members found liable individually in tort had no assurance that the judgment against them would be covered by the school district. The opinion recognized the possibility of *personal liability* in extreme cases, but it limited those cases to violations of a narrowly defined "ministerial duty" exception.

V

¶ 69. *Meyer* reappeared in the case of *Chart v. Dvorak,* 57 Wis. 2d 92, 203 N.W.2d 673 (1973). *Chart* is instructive in showing how we have retreated from state liability in tort.

658

¶ 70.   Penelope Chart was a passenger in a car that failed to negotiate a sharp curve at an intersection on a state highway in Vilas County. *Id.* at 94. The car crashed into a power pole, and Chart was severely injured. *Id.* She sued Carl Dvorak, the chief maintenance engineer of District Seven of the State Highway Commission, and Martin Varekois, the district traffic supervisor for that district. *Id.* at 95. She claimed that the two defendants were causally negligent in: (a) failing to place critical highway warning signs far enough in advance of the intersection to provide an adequate warning to approaching traffic; and (b) "placing the warning sign[s] at a distance from the intersection so as to make it impossible for a driver traveling at a legal rate of speed to negotiate the corner safely." *Id.* There was no dispute that the two defendants had no role in the actual placement of the warning signs and did not supervise their placement. *Id.* at 96.

¶ 71.   The court rejected the defendants' arguments. The court's opinion included the following statements:

> The alleged wrongful act . . . is an insufficient warning of a known highway hazard. As both Dvorak and Varekois had official, nondelegable authority and responsibility for the placement of such highway warning signs, they are the proper parties defendant.[7]

> . . . .

> Appellants' second argument is that the placement of a highway warning sign is a legislative or quasi-

---

[7] *Accord Seward v. Town of Milford,* 21 Wis. 491 (*485), 494 (*488) (1867) (affirming judgment of negligence against the town for its failure to make a damaged roadway safe for travel by either "repair[ing the roadway] at once, or at least . . . keep[ing] up some suitable guards to prevent travelers from going over the dangerous track").

legislative decision and . . . cannot predicate liability for an accident resulting from its location. In this respect we think the trial court correctly . . . conclu[ded] that once appellants made the legislative or quasi-legislative decision to place the highway warning sign, they had a duty to place it and maintain it without negligence.

. . . .

Appellants' final contention is that the trial court ought to have granted their motion for summary judgment because they cannot be individually liable in tort even if they did not place the highway warning signs in conformity with the state highway commission's legislative directive. Here again appellants advance two arguments . . . . The first is that since the appellants were agents of the state highway commission . . . their acts were the acts of such commission and, therefore, they are entitled to partake of the governmental immunity enjoyed by the commission. Appellants cite no authority for this proposition. There is none. *It is obvious that the state is immobile absent employees or agents to carry on its functions. All state employees are, therefore, agents of the state when performing those tasks entrusted to them.* [To agree with appellants' position that they, as agents of the highway commission, ought to be allowed to partake of the governmental immunity enjoyed by that commission, this court would have to overlook the long settled law of this state, embodied in sec. 270.58 [(1965–66)], that public officers or employees may be proceeded against in their official capacities.] We conclude, therefore, that appellants, as public officials, may be proceeded against for dereliction of their duties resulting in injury to another.

. . . .

. . . Here, the appellants were responsible for the proper sign placement and, therefore, are the proper parties defendant.

*Id.* at 98, 100–01, 102–04, 105 (emphasis added) (internal footnotes omitted and outer brackets in original).

¶ 72. This ruling spooked the Wisconsin Department of Justice, which moved for reconsideration and caused the court to clarify the bracketed sentence from page 103 of the opinion. The court's clarification stated the following:

> The opinion refers to sec. 270.58, Stats. [(1965–66)], as embodying "the long settled law . . . that public officers or employees may be proceeded against in their official capacities." On rehearing, it has been called to our attention that the quoted portion of the statement could be construed as a rule of liability. It was not so intended; and were it given that blanket interpretation, it would be incorrect. Sec[tion] 270.58 [(1965–66)] imposes an obligation on the state or municipality only if a judgment has been secured against the officer or employee. As stated in the opinion, the duty of the defendants herein was of a nondelegable, ministerial nature. These facts, if proved on trial, *would impose liability not on the basis of sec. 270.58, but rather on the rationale of Meyer v. Carman.*

*Id.* at 105 (emphasis added).

¶ 73. The court turned to *Meyer* again in *Cords v. Ehly,* 62 Wis. 2d 31, 214 N.W.2d 432 (1974). In this case, three young women fell into a gorge at a state park in Sauk County. *Id.* at 33. The plaintiffs sued seven state employees for negligence "in allowing the park to be open during hours of darkness, in failing to guard the trails which run along the very edge of the cliffs above the gorge, and in failing to give any warning of the naturally hazardous nature of the terrain." *Id.* The supreme court rejected the state's contention that the employees were immune from suit:

661

[T]he defendant employees are sued as private individuals for damages alleged to have resulted from their negligent conduct. The alleged conduct occurred within the scope of their employment by the state . . . .

. . . .

The individual state employee defendants in this case contend that sec. 270.58, Stats. [(1965–66)], automatically transforms any suit against a state employee into a suit against the state because the state is potentially liable on the judgment. However, if sec. 270.58 [(1965–66)] is read to provide that suits in tort against state employees are to be treated as suits in tort against the state, and if the legislature has not by that statute consented to suits in tort against the state, then no damage judgments could be obtained in suits against state employees, *and the provision in sec. 270.58 [(1965–66)] for the payment of such damages out of state funds would be meaningless.*

Quite the contrary, it is clear that in enacting sec. 270.58 [(1965–66)], Stats., the legislature contemplated that state employees were subject to suit in tort under the law of Wisconsin and wished gratuitously to shield them from monetary loss in such suits.

. . . .

In *Forseth v. Sweet,* this court said that "[n]o new exposure to substantive liability was contemplated by this statute." The most recent case to discuss sec. 270.58 [(1965–66)], Stats., was *Chart v. Dvorak.* . . .

. . . .

. . . Any liability of state employees is governed by the common law as adopted in this state by the supreme court. If the defendants are liable under the applicable doctrines, then sec. 270.58 [(1965–66)] provides that the state will pay the judgment if the action or inaction

giving rise to the liability was done in good faith within the scope of state employment. Sec[tion] 270.58 [(1965–66) does not become applicable until after a judgment of liability is entered.

. . . .

The defendants call this court's attention to the case of *Meyer v. Carman.* . . .

The cases of *Meyer v. Carman* and *Chart v. Dvorak* are distinguishable and not contradictory. The *Meyer* [c]ase, confined to its facts, concerns the absence of personal liability of school board members, where they are considered to be performing discretionary duties. *Chart* involves the alleged performance of ministerial, nondiscretionary duties.

. . . .

The *Meyer* [c]ase reiterates the general rule that "a public officer who knowingly or negligently fails to do a ministerial act which the law requires him to do may be compelled to respond in damages to an injured party." In *Chart v. Dvorak* the court, applying the ministerial/discretionary distinction, held that highway commission engineers could not be held liable for the decision as to whether or not to locate a traffic sign at a particular place, but that once the decision was made, the signs were to be placed in accord with standards developed by the highway commission. Therefore, the actual placement of the signs was ministerial. This court held that a question of fact was presented as to whether the signs in question had been properly placed. The court also concluded that the named defendants had the nondelegable duty to see that the signs were properly placed.

A different question of fact is presented here as to whether the alleged negligence is in the performance of ministerial duties by the individual defendants. It can-

not be said on the basis of the complaint that the plaintiffs will be unable to prove any set of facts in support of their claim which would entitle them to relief.

*Cords,* 62 Wis. 2d at 35–41 (emphasis added) (footnotes omitted).

¶ 74. This brings us back to *Lister,* where the court stated as follows:

> The general rule is that a public officer is not personally liable to one injured as a result of an act performed within the scope of his official authority and in the line of his official duty. The various exceptions to this rule are determined by a judicial balancing of the need of public officers to perform their functions freely against the right of an aggrieved party to seek redress.
>
> The most generally recognized exception to the rule of immunity is that an officer is liable for damages resulting from his negligent performance of a purely ministerial duty. *A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.*

*Lister,* 72 Wis. 2d at 300–01 (emphasis added) (citations omitted).

¶ 75. *Lister* shifted the focus from liability to immunity, and it severely limited the exception to immunity by defining ministerial duty with words like "absolute, certain and imperative" that had been used many years before when governmental immunity, including municipal immunity, was still in full force. This rigid, inflexible formulation was inconsistent with cases

like *Chart* and *Cords*. *Lister* never mentioned *Holytz*. None of the *Lister* justices had participated in the *Holytz* decision.

¶ 76.  In 1977, in *Lifer v. Raymond*, 80 Wis. 2d 503, 259 N.W.2d 537 (1977), the supreme court rewrote history as it firmed up the effective restoration of governmental immunity. Rebutting an accident victim's exaggerated argument that under *Holytz* there should be no distinction between the liability of a state employee and the liability of a private citizen, the court stated as follows:

> That is not what *Holytz* says or means. *Holytz* dealt with the doctrine of sovereign immunity in an action against a governmental body, not a public officer.
>
> . . . .
>
> Although the plaintiff contends that the defendant is immune from suit only for acts which are legislative, judicial, quasi-legislative or quasi-judicial, we base our contrary conclusion on the principles of official immunity set out in *Lister* that the defendant is not liable for his discretionary acts. To so hold is not to imply that the test for the immunity of a state officer set out in *Lister* is different from the test for the immunity of a municipal officer under sec. 895.43(3), Stats. A quasi-legislative act involves the exercise of discretion or judgment in determining the policy to be carried out or the rule to be followed. A quasi-judicial act involves the exercise of discretion and judgment in the application of a rule to specific facts. Acts that are "legislative, quasi-legislative, judicial or quasi-judicial functions," are, by definition, nonministerial acts. As applied, the terms "quasi-judicial or quasi-legislative" and "discretionary" are synonymous . . . .

*Lifer*, 80 Wis. 2d at 510–12 (citations omitted).

¶ 77. This pronouncement, unsupported by authority, changed the course of Wisconsin tort law. For, as Professor Prosser noted in his treatise, "It would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail." Prosser, *supra*, at 1017 (quoting *Ham v. Los Angeles County*, 189 P. 462, 468 (Cal. App. 1920)).

¶ 78. *Lister, Lifer*, and *Kimps* have become the hallmark decisions that define the militantly unprogressive state of Wisconsin law. So far as government responsibility for torts is concerned, immunity has become the rule and liability has become the rare exception. Justice has been confined to a crawl space too narrow for most tort victims to fit.

## VI

¶ 79. In the case at hand, the court of appeals was forced to deal with these decisions. *Umansky v. ABC Ins. Co.*, 2008 WI App 101, 313 Wis. 2d 445, 756 N.W.2d 601. The opinion of Judge Vergeront is scholarly, well-reasoned, and highly persuasive. Fortunately, it is being adopted by the majority in an excellent opinion by Justice Crooks. Sooner or later this court will realize that accountability is the price of justice.

¶ 80. For the reasons stated, I respectfully concur.

¶ 81. I am authorized to state that JUSTICE N. PATRICK CROOKS joins this concurrence.

¶ 82. ANNETTE KINGSLAND ZIEGLER, J. (*dissenting*). The issue before the court is whether Barry Fox, an individual employee of the state of Wisconsin, is immune from liability for an accident to an ABC, Inc.

employee who was working at Camp Randall Stadium. I must dissent from the majority opinion because the majority ignores the plain language of the Wisconsin statutes and administrative code and instead improperly relies on OSHA provisions to create a ministerial duty where none exists.

¶ 83. As a result of the majority decision, a windfall recovery is potentially created for any non-state employee who can obtain both worker's compensation and a recovery against the state employee, while an injured state employee under the same circumstances would be limited to a worker's compensation recovery. The majority opinion also opens the door to allow any injured frequenter recovery against the state or a state employee. Until today, the state was treated by the legislature differently than a private employer in order to protect the public fisc. Accordingly, I respectfully dissent.

## I. MINISTERIAL DUTY IMPOSED BY LAW

¶ 84. "Under the general rule as applied in Wisconsin, state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." *Kimps v. Hill,* 200 Wis. 2d 1, 10, 546 N.W.2d 151 (1996) (citing *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 300, 240 N.W.2d 610 (1976)). For public officers, immunity is the rule and liability is the exception, unlike municipalities, where liability is the rule and immunity is the exception. *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 22, 253 Wis. 2d 323, 646 N.W.2d 314. Immunity for public officers and employees of the state "is based largely upon public policy considerations that spring from the interest in protecting the public purse and a preference

for political rather than judicial redress for the actions of public officers." *Id.*, ¶ 23 (setting forth a number of policy considerations).

¶ 85. This doctrine of immunity, however, is not without exceptions. *Id.*, ¶ 24. There is no immunity against liability associated with: "1) the performance of ministerial duties imposed by law; 2) known and compelling dangers that give rise to ministerial duties on the part of public officers or employees; 3) acts involving medical discretion; and 4) acts that are malicious, willful, and intentional." *Id.*

¶ 86. "The ministerial duty exception is not so much an exception as a recognition that immunity law distinguishes between discretionary and ministerial acts, immunizing the performance of the former but not the latter." *Id.*, ¶ 25. "A ministerial duty is one that 'is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.' " *Id.* (citing *Lister*, 72 Wis. 2d at 301).

¶ 87. To assist in determining whether an act is discretionary or ministerial, this court has traditionally examined such things as a statute, the administrative code, or other materials that are unique to a specific case, such as job descriptions or policy manuals.

¶ 88. For example, in *Lister*, the court was asked to decide if the registrar's classification of students for tuition purposes was ministerial in nature. *Id.* at 300. The plaintiffs argued that when the registrar determines a student's residency status, which could entitle the student to lower tuition costs, the determination was ministerial. *Id.* The relevant statute provided in part,

(1)(a) Any adult student who has been a bona fide resident of the state for one year next preceding the beginning of any semester for which such student registers at the university . . . shall while he continues a resident of the state be entitled to exemption from nonresident tuition . . . .

. . . .

(3) In determining bona fide residence, filing of state income tax returns in Wisconsin, eligibility for voting in this state, motor vehicle registration in Wisconsin, and employment in Wisconsin shall be considered. . . .

Wis. Stat. § 36.16 (1969–70).

¶ 89. The court concluded that "[t]he statute did not prescribe the classification process with such certainty that nothing remained for the administrative officer's judgment and discretion." *Lister,* 72 Wis. 2d at 301. The court stated that "[i]t must be conceded that an officer charged with the administration and application of the standards set forth in [§] 36.16 [] could make mistakes in judgment which would result in an erroneous classification." *Id.* at 302. As a result, the court concluded that "the policy considerations underlying the immunity principle require that the officer be free from the threat of personal liability for damages resulting from mistakes of judgment." *Id.*

¶ 90. In *Kimps,* the plaintiff was injured at the University of Wisconsin-Stevens Point while moving a "volleyball standard." *Kimps,* 200 Wis. 2d at 6. As she was moving the "standard," "the metal base separated from the pole and fell onto her foot." *Id.* The plaintiff asserted that the safety director was liable because he breached a ministerial duty set forth in the safety director's job description. *Id.* at 14. The job description

669

provided in relevant part: "Investigate all incidents and take action to correct the condition or procedure that caused the accident." *Id.* The plaintiff argued that because a maintenance worker was similarly injured two years earlier, the safety director should have personally tightened the set screws or directed someone to tighten the set screws in order to prevent another accident. *Id.* The court concluded that the safety director's job description did not create a ministerial duty because the " 'time, mode and occasion' for performing an investigation of the maintenance worker's accident and determination of the appropriate corrective action to be taken remained totally within [the safety director's] judgment and discretion." *Id.* at 15.

¶ 91. In *Lodl,* the plaintiff asserted that the police officer had a ministerial duty to manually control traffic at an intersection where traffic control lights were no longer working. *Lodl,* 253 Wis. 2d 323, ¶¶ 6–8, 27. This court concluded that the applicable statute and the police department's policy did not confer a ministerial duty on the police officer to manually direct traffic. *Id.,* ¶¶ 27–28. The statute at issue did not direct the officer to perform manual traffic control in any specific situation, and the policy described manual traffic control procedures only if the officer decided to manually control traffic. *Id.* Neither the statute nor the policy eliminated the officer's discretion as to when or where to undertake manual traffic control. *Id.,* ¶¶ 28–31.

¶ 92. In *Noffke v. Bakke,* a plaintiff asserted that cheerleading spirit rules established a ministerial duty that required the coach to provide a spotter and mats for a cheerleading stunt. 2009 WI 10, ¶ 45, 315 Wis. 2d 350, 760 N.W.2d 156. We concluded that the spirit rules were more appropriately characterized as "guidelines" and did not include mandatory language dictating a

specific action. *Id.*, ¶ 45–47. For example, the spirit rules provided in part that "[a]ll spirit activities should be held in a location suitable for spirit activities with the use of mats, free of obstructions, and away from excessive noise or distractions." *Id.*, ¶ 46. As a result, we determined that the spirit rules did not set forth a ministerial duty, but rather, they provided the cheerleading coach with significant discretion. *Id.*, ¶ 51.

¶ 93. In the case at hand, the majority concludes that a ministerial duty imposed by law precludes immunity in this case. I, however, disagree that Fox has a ministerial duty imposed by law under the facts of this case. The Umanskys and the majority focus their attention on the federal OSHA regulations that have been incorporated into the Wisconsin Administrative Code. They argue that Fox individually had a ministerial duty to ensure that the platform's front side had a railing. A proper analysis, however, begins with a plain reading of Wis. Stat. § 101.055 and then the Wisconsin Administrative Code, rather than beginning with the language of the federal regulations.

A.  Wisconsin statutes and administrative code

¶ 94. In order to determine if Fox had a ministerial duty in the case at hand, it is necessary to review the Wisconsin statutes as well as the administrative code, which has incorporated by reference a portion of the federal regulations.

¶ 95. "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. This court begins statutory interpretation with the language of the

statute. *Id.*, ¶ 45. If the meaning of the statute is plain, we ordinarily stop the inquiry and give the language its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*

¶ 96.   Context and structure of a statute are important to the meaning of the statute. *Id.*, ¶ 46. "Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.* Moreover, the "[s]tatutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." *Id.* "A statute's purpose or scope may be readily apparent from its plain language or its relationship to surrounding or closely-related statutes—that is, from its context or the structure of the statute as a coherent whole." *Id.*, ¶ 49. " 'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.' " *Id.*, ¶ 46 (citation omitted). If statutory language is unambiguous, we do not need to consult extrinsic sources of interpretation. *Id.*

¶ 97.   Wisconsin Stat. § 101.055 (2001–02)[1] provides in relevant part:

> (1) INTENT. It is the intent of this section to give employees of the state, of any agency and of any political subdivision of this state rights and protections relating to occupational safety and health equivalent to those granted to employees in the private sector under

---

[1] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

the occupational safety and health act of 1970 (5 USC 5108, 5314, 5315 and 7902; 15 USC 633 and 636; 18 USC 1114; 29 USC 553 and 651 to 678; 42 USC 3142–1 and 49 USC 1421).

. . . .

(3) STANDARDS. (a) The department shall adopt, by administrative rule, standards to protect the safety and health of public employees. The standards shall provide protection at least equal to that provided to private sector employees under standards promulgated by the federal occupational safety and health administration . . . .

¶ 98.   Pursuant to Wis. Stat. § 101.055, the Wisconsin Administrative Code, Ch. Comm 32, Public Employee Safety and Health, provides in relevant part:

Comm 32.001 Purpose. This chapter establishes minimum occupational safety and health standards for public employees.

Comm 32.002 Scope. The provisions of this chapter apply to all places of employment and public buildings of a public employer.

. . . .

Comm 32.01 Definitions. . . .

. . . .

(5) "Public employee" or "employee", as defined in s. 101.055(2)(b), Stats., means any employee of the state, of any state agency or of any political subdivision of the state.

. . . .

673

Comm 32.15 OSHA Safety and health standards. Except as provided in s. Comm 32.16 and subch. IV, all places of employment and public buildings of a public employer shall comply with the federal Occupational Safety and Health Administration (OSHA) requirements adopted under s. Comm 32.50.

¶ 99.  Wisconsin Admin. Code § Comm 32.50 incorporates by reference 29 C.F.R. Part 1910, which provides in relevant part at 29 C.F.R. § 1910.23(c)(1):

Every open-sided floor or platform 4 feet or more above adjacent floor or ground level shall be guarded by a standard railing (or the equivalent as specified in paragraph (e)(3) of this section) on all open sides except where there is entrance to a ramp, stairway, or fixed ladder. . . .

¶ 100.  When reading the text of the relevant Wisconsin statute and administrative code provision, it becomes clear that Fox did not have a ministerial duty to install a railing in this case for the following four reasons.

¶ 101.  First, both Wis. Stat. § 101.055 and Wis. Admin. Code § Comm 32.001 plainly state that the standards adopted pursuant to these provisions are meant to protect the safety and health of public employees. "Public employee or employee" "means any employee of the state, or any state agency or of any political subdivision of the state." Wis. Admin. Code § Comm 32.01(5). Thus, to the extent that a ministerial duty may arise out of these provisions, that ministerial duty is owed to public employees. Umansky, however, was a private employee of ABC, Inc. Because the relevant provisions address only a duty to public employees, any action Fox could have taken that would

674

have benefitted Umansky was discretionary rather than ministerial.

¶ 102. Second, the legislature's decision to reference public employees only and thus limit the provision's applicability must be respected because the provisions could have been drafted more broadly. *See C. Coakley Relocation Sys., Inc. v. City of Milwaukee,* 2008 WI 68, ¶ 24 n.10, 310 Wis. 2d 456, 750 N.W.2d 900 (stating that courts must presume that the legislature says what it means in a statute; the legislature's omissions must be respected; and it is generally not acceptable for courts to insert words into the statute). If the legislature meant for this statute to apply to more than just public employees, it could have included other verbiage, such as the word "frequenters." For example, Wis. Stat. § 101.11(1), Employer's duty to furnish safe employment and place, provides that "[e]very employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which *shall be safe for employees therein and for frequenters* thereof and shall furnish and use safety devices and safeguards . . . ." (Emphasis added.) In contrast, the legislature used no such language to expand coverage beyond public employees in the provisions now at issue. The majority opinion today, however, makes the state a deep pocket for any frequenter of a state building despite the fact that the term "frequenter" is absent from the relevant statutes and codes.

¶ 103. Third, unlike in *Lister, Kimps, Lodl,* and *Noffke* where the controlling documents contained no restrictions as to whom a ministerial duty could be owed, the statute and code in this case do contain a restriction as to whom a ministerial duty may be owed—a public employee. We must respect the legislature's decision. When the legislature enacted

protective provisions, it limited that protection to public employees. This, however, does not provide a public employee with more protection than a private employee because 29 C.F.R. §§ 1910.2 and 1910.23 on their face protect private employees. Therefore, private employees are not without protection; they are protected by the OSHA provisions and the duty that their employer owes them.

¶ 104. Fourth, the foregoing interpretation is consistent with the principle that an administrative rule may not be read so as to provide protection broader than that contemplated by its authorizing statute. *Josam Mfg. Co. v. State Bd. of Health,* 26 Wis. 2d 587, 600–01, 133 N.W.2d 301 (1965). The authorizing statute, Wis. Stat. § 101.055, clearly sets forth that the protections belong specifically to public employees. If we conclude that the provisions at issue here could establish that Fox had a ministerial duty to Umansky, we would be reading the provisions well beyond the stated purpose of protecting public employees.

¶ 105. While I conclude there is no ministerial duty in this case, I further note that the majority does not completely address Fox's argument with regard to whether public employees worked on the platform in question. Majority op., ¶ 22 & n.16. Though it is true that Fox argues that Umansky needed to prove that a public employee was working on the platform *at the time Umansky fell,* an argument which the majority *does* address, *id.,* Fox argues in the alternative that it was at least necessary to show that public employees in the course of their employment had worked on the platform in question *at some point in time.* If no public employees ever worked on the platform, then it would not have been a regulated "platform" under 29 C.F.R. § 1910.21(a)(4) from the state's perspective, and Fox

could have been under no obligation to have a railing in place. The court of appeals discussed this argument as follows, and expressly left the question open on remand for Fox to present evidence:

> Fox asserts that the regulation did not apply because there is no evidence this platform was ever used by a public employee as a workspace. . . . Fox points out that the definition of "platform" in 29 C.F.R. § 1910.21(a)(4) is "A working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment." As we understand Fox's position, because the purpose of Wis. Admin. Code ch. Comm 32 is to establish "minimum occupational safety and health standards for public employes," Wis. Admin. Code § Comm 32.001 (Mar. 1999), 29 C.F.R. § 1910.23(c)(1) does not apply to the platform from which Umansky fell unless it was the work space of a public employee. Apparently in Fox's view, ABC Inc. (and perhaps other commercial stations as well) was responsible for complying with the federal regulation regarding this particular platform and the University had no obligation to do so under Wis. Admin. Code ch. Comm 32. . . .
>
> . . . [T]he factual record is not fully developed, as it likely would have been had Fox raised this argument in the circuit court. That is, while the evidence at present indicates no state employees used this platform, we do not know what the evidence would show had there been further exploration of the use of the platform. . . .

Although we apply the waiver rule on this appeal, nothing in our opinion prevents the circuit court from permitting Fox to raise this argument on remand to the circuit court. So as not to suggest we are resolving this issue on this appeal, we phrase our rulings in the following paragraph with italicized caveats.

Based on the undisputed facts and the developed arguments presented to us, we conclude: (1) Fox was

responsible for compliance with state and federal safety regulations and this job responsibility is sufficient to impose on him the duty to comply with 29 C.F.R. § 1910.23(c)(1) *insofar as the regulation applies to his employer.* (2) Given the height and structure of the platform (including the upper and lower platforms) and at least one open side, Fox had a ministerial duty to have a standard railing or an alternative as specified in 29 C.F.R. § 1910.23(c)(1) on the open side or sides of the upper platform, *if Fox's employer was required by state law to comply with this regulation as to this platform.*

*Umansky v. ABC Ins. Co.,* 2008 WI App 101, ¶¶ 63–66, 313 Wis. 2d 445, 756 N.W.2d 601 (footnotes omitted; emphasis in original). The majority makes short shrift of this argument by conflating it with Fox's argument that a public employee needed to be on the platform at the same time Umansky fell, majority op., ¶ 22 & n.16; however, it is an analytically distinct argument and necessitates that this factual question be left open on remand.

¶ 106.  Under 29 C.F.R. § 1910.21(a)(4), a regulated "platform" is defined as "[a] working space for persons, elevated above the surrounding floor or ground; such as a balcony or platform for the operation of machinery and equipment." Wisconsin Admin. Code Ch. Comm 32 establishes "minimum occupational safety and health standards for *public employees.*" Wis. Admin. Code § Comm 32.001 (emphasis added). If no public employees ever worked on the platform in question, then it was not a regulated "platform" under § 1910.21(a)(4) from the perspective of the state administrative code, and therefore Fox was under no obligation to maintain a railing. Were that found to be the case, the only employer who would have had an obligation to maintain a railing would be ABC, Inc.,

Umansky's actual employer—the only employer from whose perspective this platform was in fact a "platform" under OSHA.

¶ 107. However, as the court of appeals noted, "the factual record is not fully developed" with respect to this issue. *Umansky,* 313 Wis. 2d 445, ¶ 64. At the very least, this court should follow the court of appeals' lead and leave this question open for further fact-finding on remand before concluding as a matter of law that Fox was required to maintain a railing on the platform in question. If no public employees ever worked on the platform, it was beyond the scope of Fox's obligations.

¶ 108. The problem with a contrary holding is obvious. The majority cannot seriously intend to suggest that the burden of maintaining a railing around *every single* architectural structure which might be used by third parties as a platform at Camp Randall Stadium should be placed on Fox. Certainly, there must be a limit on the scope of his duties, even under the majority's view. That limit is apparent from the language of Wis. Admin. Code § Comm 32.001, which requires state employers to conform to "minimum occupational safety and health standards for *public employees*" (emphasis added). Private employers are responsible for their employees' safety under OSHA. Contrary to the majority's conclusions, Fox should not be expected to be everybody's keeper.

¶ 109. The Umanskys and the majority argue that the ministerial nature of Fox's duty cannot depend on the status of the person who is injured by Fox's negligence. The Umanskys assert that such a distinction is contrary to the text of the relevant provisions. Injury at a public place of employment, the Umanskys argue, is the determining factor in this case and, thus, the

distinction between public and private employees is irrelevant under their theory. For the following three reasons, I disagree with the reliance on where the injury takes place and disregard for the employee's status as a public or private employee.

¶ 110.  First, this argument ignores the full text of the Wisconsin Administrative Code. While Wis. Admin. Code § Comm 32.002 states that "[t]he provisions of this chapter apply to all places of employment and public buildings of a public employer," the administrative code also states in § Comm 32.001 that "[t]his chapter establishes minimum occupational safety and health standards for public employees." As a result, when read together, these provisions protect public employees in public places. The Umanskys' argument ignores the text of the relevant administrative code provisions.

¶ 111.  Second, such an interpretation does not, as the Umanskys argue, lead to more protection for public employees than for private employees. Both private and public employees are equally protected when working on the platform at issue in this case. On their face, the OSHA regulations apply to protect a private employee. *See* 29 C.F.R. §§ 1910.1, 1910.2, 1910.5. In this case, ABC, Inc. was fined $7,000 for failing to ensure that a railing guarded the front side of this platform.[2] The administrative code protects public employees through the incorporation by reference of OSHA provisions. *See* Wis. Admin. Code §§ Comm 32.15 and 32.50. Both the private employee and the public employee are protected under Wisconsin's Worker's Compensation provisions.

[2] In fact, in 1999, it was ABC, Inc. and a camera technician for ABC, Inc. that requested the railing be removed because the camera technician stated he could not "pan the camera" when the railing was in place.

*See generally* Wis. Stat. ch. 102; *see* Wis. Stat. § 102.03(2) (stating that the right to recovery under this chapter is "the exclusive remedy against the employer").

¶ 112.   Third, it is not that the ABC employee is without recourse, but rather, the proper recourse is not against Fox individually. A private employee has recourse against his employer. Under the Umanskys' logic, Umansky, unlike a state employee, is entitled to a windfall. Unlike a state employee, the ABC employee can obtain one recovery against his employer and one recovery against a public employee. However, a public employee would be limited to just one recovery. Wis. Stat. § 102.04(1) (The state is subject to worker's compensation.).

¶ 113.   I conclude that a reading of the relevant authorities consistent with their plain language provides that Fox did not have a ministerial duty to install a railing for the benefit of Umansky. Accordingly, I would hold that Fox did not violate any ministerial duty imposed by law.

B.   OSHA

¶ 114.   The majority's use of the OSHA provisions to create a ministerial duty is improper. The Umanskys are suing Fox, an employee of the state, rather than Fox's employer. The reasons for this are obvious. Were the Umanskys to sue the state directly, the state would be shielded from liability under the doctrine of sovereign immunity. *German v. DOT,* 2000 WI 62, ¶ 17, 235 Wis. 2d 576, 612 N.W.2d 50 ("It is axiomatic that the state cannot be sued without the express consent of the legislature.") (citing *Lister,* 72 Wis. 2d at 291; *Chicago, M. & St. P. R. Co. v. State,* 53 Wis. 509, 512–13, 10 N.W.

560 (1881); *Bahr v. State Inv. Bd.*, 186 Wis. 2d 379, 521 N.W.2d 152 (Ct. App. 1994)).

¶ 115.   It is also telling that the Umanskys have gone out of their way to avoid having the claim characterized as being brought under Wisconsin's Safe Place Statute, despite the fact that many of their allegations, at first glance, would seem to state the type of claim that should be brought under that statute. *See* Wis. Stat. § 101.11 (requiring every employer to "furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters"). The majority opinion follows the Umanskys' lead. Majority op., ¶ 26.

¶ 116.   The reasons for the majority opinion's avoidance of the safe place statute are obvious. First, the duty imposed under the safe place statute is discretionary and cannot form the basis for a ministerial duty. *Spencer v. County of Brown*, 215 Wis. 2d 641, 651, 573 N.W.2d 222 (Ct. App. 1997). Therefore, Fox, who is a state employee, is shielded from liability for a violation of the safe place statute by public officer immunity, which precludes liability against state employees for discretionary acts negligently undertaken. *Id.*

¶ 117.   Second, the duty imposed by the safe place statute is a duty imposed on the *employer* or owner of the facility in question, not the *employees*. Employees cannot be sued for a violation of the safe place statute, nor can the duty imposed under that statute be delegated by the employer or owner to the employees in a manner allowing the employer or owner to avoid liabil-

682

ity. *Pitrowski v. Taylor,* 55 Wis. 2d 615, 624, 201 N.W.2d 52 (1972) ("[A] safe-place action can be brought only against an employer corporation and not against an employee of the corporation. . . . [A]s to the safe-place statute, '. . . it is the employer who is liable, rather than an agent of the employer. . . .' " (quoting *Wasley v. Kosmatka,* 50 Wis. 2d 738, 744, 184 N.W.2d 821 (1971)); *see also Dykstra v. Arthur G. McKee & Co.,* 100 Wis. 2d 120, 130, 301 N.W.2d 201 (1981) ("It is, of course, clear that the duty of an owner or employer under the safe place statute is nondelegable."). Accordingly, even if the safe place statute imposed a ministerial duty, which it does not, Fox, an employee, could not be sued for a violation of its provisions. *See Pitrowski,* 55 Wis. 2d at 624.

¶ 118.  Although Fox cannot be sued for a violation of the safe place statute, significant contrasts can be drawn between the safe place statute and the OSHA regulations the majority uses to manufacture a ministerial duty for Fox.

¶ 119.  First, although the duty imposed by OSHA regulations is a duty imposed not just on employers, but on employees as well, 29 U.S.C.A. § 654(b), sanctions for noncompliance with OSHA regulations by either an employer or employee rest solely on the shoulders of the employer; employees cannot be sanctioned for OSHA violations. *See United States v. Doig,* 950 F.2d 411, 413 (7th Cir. 1991) (concluding that, despite § 654(b)'s directive, OSHA does not permit sanctioning of employees for their own violations of OSHA; only employers can be sanctioned); *Atlantic & Gulf Stevedores, Inc. v. OSHRC,* 534 F.2d 541, 553 (3d Cir. 1976) (same); *see also Minichello v. U.S. Indus., Inc.,* 756 F.2d 26, 29 (6th Cir. 1985) ("OSHA regulations pertain only to employers' conduct.") (citing 29 U.S.C. § 654; *McKinnon v. Skil*

*Corp.,* 638 F.2d 270, 275 (1st Cir. 1981)). As a result, the duty to comply with OSHA regulations is, in a manner of speaking, nondelegable, because employers cannot avoid sanctions for noncompliance by arguing that it was the employee's, not the employer's, responsibility to comply with the duty imposed.

¶ 120.   Second, under 29 U.S.C.A. § 653(b)(4), violations of OSHA cannot be used as a basis for expanding or diminishing common law civil liability; that is, OSHA does not create a private right of action that did not already exist at common law. *Minichello,* 756 F.2d at 29; *see also Russell v. Bartley,* 494 F.2d 334, 336 (6th Cir. 1974) ("[T]here is no legislative history or case law to support [the] proposition that OSHA created a private civil remedy and the clear language of [29 U.S.C.A.] § 653(b)(4) . . . specifically evidences a congressional intention to the contrary.").

¶ 121.   Having set forth these principles, the flaw in the majority opinion's analysis becomes apparent. The majority is using OSHA regulations, which do not impose a sanctionable duty on employees, *Doig,* 950 F.2d at 413, and which do not create a private civil remedy, *Russell,* 494 F.2d at 335, to create a civil claim against an *employee* where there would not otherwise be a claim because it would be precluded by public officer immunity. That is, by using OSHA regulations as the basis for creating a ministerial duty, OSHA is being used to *expand* liability where it would not otherwise exist. This is directly contrary to one of OSHA's express congressional directives:

> Nothing in this chapter shall be construed to . . . enlarge or diminish or affect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under any law with respect to

684

injuries, diseases or death of employees arising out of, or in the course of, employment.

29 U.S.C.A. § 653(b)(4).

¶ 122. The majority opinion is improperly using OSHA to create a new civil claim. Although one could use OSHA regulations as evidence that the duty to exercise ordinary care has been breached, *see, e.g., Elliott v. S.D. Warren Co.,* 134 F.3d 1, 5 (1st Cir. 1998), the majority opinion goes further, using OSHA regulations to establish a ministerial duty for Fox, a state employee. The problem with this is demonstrated by the following discussion.

¶ 123. The distinction between the duty of ordinary care and a ministerial duty is critical to understand. A ministerial duty requires something more than the exercise of ordinary care. *See Kimps,* 200 Wis. 2d at 11 ("Just because a jury can find that certain conduct was negligent does not transform that conduct into a breach of a ministerial duty."); *id.* at 12 n.8 ("The existence of a duty of care to another does not necessarily imply that the duty was ministerial."). Accordingly, when public officer immunity is asserted as a defense, and a ministerial duty is asserted as an exception to that defense, negligence is assumed. *Noffke,* 315 Wis. 2d 350, ¶ 57 ("The immunity defense assumes negligence." (citing *Lodl,* 253 Wis. 2d 323, ¶ 17)). Therefore, if it can be shown that Fox had a ministerial duty that he failed to perform, which the majority concludes is presented here, the sole question will be whether Fox's failure to perform that ministerial duty was a cause of Umansky's injuries. *Id.*

¶ 124. In creating a ministerial duty for Fox based on OSHA regulations, the majority eviscerates the express directive of 29 U.S.C.A. § 653(b)(4). Stated

otherwise, the majority uses OSHA regulations to create a cause of action where no cause of action would otherwise exist. Furthermore, this cause of action will now be even easier to prove than ordinary negligence.

¶ 125. The effect of the majority's analysis is not just to disregard 29 U.S.C.A. § 653(b)(4), however. By giving the Umanskys a cause of action on these facts and based on the allegations they have set forth, the majority is permitting the Umanskys to pursue what is essentially an action under the safe place statute, while allowing them to avoid the inconvenient case law stating that (1) the duty imposed by the safe place statute is discretionary, not ministerial, and therefore cannot create an exception to public officer immunity, *Spencer,* 215 Wis. 2d at 651; and (2) only an employer or owner can be sued for a violation of the safe place statute, *Pitrowski,* 55 Wis. 2d at 624; *Wasley,* 50 Wis. 2d at 744. The majority has allowed the Umanskys' creative lawyering to result in the manufacture of a new cause of action heretofore unheard of under Wisconsin law. It has abandoned all protections of the public fisc that governmental immunity is intended to provide.

## II. CONCLUSION

¶ 126. This case requires a straightforward analysis of the Wisconsin statutes and administrative code in order to determine whether Fox was immune from liability arising out of an incident that occurred at Camp Randall Stadium. The majority disposes of this case by ignoring the plain language of the Wisconsin statutes and administrative code and instead improperly relies on OSHA provisions to create a ministerial duty where none exists. Because Fox had no ministerial duty in this case, there is no exception to the rule of

immunity. As a result, I would conclude that Fox is immune from liability, and therefore, I respectfully dissent.

¶ 127. I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this dissent.